# EXHIBIT A

1  Phil Horowitz (State Bar #111624)
   Christopher Banks (State Bar #279895)
2  Law Offices of Phil Horowitz
   428 Thirteenth Street, 11th Floor
3  Oakland, CA 94612
   Telephone:  (415) 391-0111
4  E-mail:  phil@philhorowitz.com

5  Attorneys for Complainant
   Johnny Valverde

6
                    **American Arbitration Association**
7

8  JOHNNY VALVERDE,                    )    COMPLAINT FOR:
                                       )
9                 Complainant,         )    (1)  RETALIATION IN VIOLATION OF
                                       )         LABOR CODE SECTION 1102.5
10                                     )    (2)  DISCHARGE IN VIOLATION OF
        v.                             )         PUBLIC POLICY
11                                     )
   FIRST REPUBLIC BANK,                )
12 INC. and DOES 1 through 50,         )
   inclusive,                          )
13                                     )
                  Respondents.         )
14 _____    )

15     Complainant JOHNNY VALVERDE complains against Respondents, and each

16 of them, demands arbitration of all issues, and for causes of action alleges:

17                              **PARTIES**

18     1.  Complainant Johnny Valverde ("Johnny Valverde") was employed by

19 Respondent First Republic Bank beginning on about July 25, 2016. During that

20 time and since, Mr. Valverde has been a citizen of the State of California.

21     2.  Respondent First Republic Bank is a corporation doing business in the

22 state of California, including in San Francisco County. Respondent First Republic

23 Bank is sometimes referred to in this Complaint as "the Bank."

24     3.  The true names and capacities of Respondents sued as Does are

25 unknown to Complainant. Complainant is informed and believes that each of the

26 Doe Respondents was responsible in some way for the occurrences and injuries

27 alleged in this Complaint.

28     4.  Complainant is informed and believes that in doing the things alleged in

Arbitration Complaint                    - 1 -

1  this Complaint, each Respondent was acting as an agent or employee of every

2  other Respondent, was acting within the course and scope of this agency or

3  employment, and was acting with the consent, permission, and authorization of

4  each of the remaining Respondents. Complainant is also informed and believes

5  that all actions of each Respondent alleged in this Complaint were ratified and

6  approved by the officers or managing agents of every other Respondent.

7  **FACTS COMMON TO ALL CAUSES OF ACTION**

8  5. Complainant Johnny Valverde began his employment with Respondent

9  First Republic Bank on about July 25, 2016.

10  6. Throughout the entirety of his employment with First Republic Bank,

11  Johnny Valverde worked as the Director of Payments Product Management out

12  of the Bank's office at 388 Market Street in San Francisco, California. Mr.

13  Valverde would have continued working at that location but for the termination

14  of his employment by the Bank on about January 8, 2019.

15  7. Before Mr. Valverde was deemed by the Bank to be an employee,

16  he worked for the Bank with the label of "contractor" beginning in about

17  October 2014 until he was hired to work permanent full time in about July

18  2016. Actually, by law Mr. Valverde was an employee during this period.

19  8. While working for First Republic Bank as a contractor, Mr. Valverde

20  reported to Adam Rose (VP/Director, Payment Strategies), who initially hired

21  Mr. Valverde in about October 2014 on a six month contract as a business

22  analyst. After seeing Mr. Valverde's good work during his first six month

23  contracting job for the Bank, Mr. Rose extended Mr. Valverde's contract another

24  six months and bumped his position up to Operations Manager. As Operations

25  Manager, Mr. Valverde took over full control of product support and operations,

26  managed two contractors and one vendor, and received about a 10% increase

27  in his hourly pay.

28  9. In about October 2015, due to Mr. Valverde's good work, Adam Rose

Arbitration Complaint               - 2 -

1   extended Mr. Valverde's contract as Operations Manager another six months.
2   Beginning around that time, Mr. Rose began trying to recruit Mr. Valverde to
3   work for the Bank in a permanent full time position as the Bank's Director of
4   Payments Product Management. Mr. Valverde initially declined Mr. Rose's offer
5   of permanent employment, and continued to do so for about the next six
6   months, while negotiating a number of terms.

7       10.  After Mr. Valverde's six month contract expired in October 2015, Mr.
8   Rose rehired Mr. Valverde on a month to month contract until Mr. Valverde
9   began working as a permanent full time employee of First Republic Bank in July
10  2016. When Mr. Valverde finally accepted Mr. Rose's job offer as Director of
11  Payments Product Management in about July 2016, it was with the agreement
12  that he would be working towards a promotion to Vice President of Payments
13  Product Management.

14      11.  Mr. Valverde could not receive performance bonuses while he
15  performed contracting work for First Republic Bank. Instead, to reward Mr.
16  Valverde for his good work, Adam Rose took him out to dinner at least once per
17  month (on average) during the period from about October 2014 to July 2016.
18  About half of these dinners were just Mr. Rose and Mr. Valverde, and the other
19  half also included other product support contractors. During these dinners, Mr.
20  Rose repeatedly complimented Mr. Valverde's good work and thanked him for
21  his contributions.

22      12.  Johnny Valverde's good job performance continued after he became a
23  permanent full time employee of First Republic Bank in July 2016, and his
24  performance was at all times satisfactory during the 2½ years up through his
25  termination.

26      13.  First Republic Bank awarded Mr. Valverde quarterly performance
27  bonuses for his good work after the Bank hired him as a permanent full time
28  employee. This included bonuses for each quarter Mr. Valverde worked in 2016

Arbitration Complaint                    - 3 -

1  and 2017, and Q1 in 2018. Each quarter's performance bonus was the
2  equivalent to about 4-5% of Mr. Valverde's annual base salary.

3      14.  The Bank also awarded Mr. Valverde at least three separate "Spot
4  Bonuses" after he became a permanent full time employee in July 2016. The
5  Bank awarded Mr. Valverde the following Spot Bonuses: about $2,500 in Q3
6  2016, about $2,500 in Q4 2016, and about $8,000 in Q2 2017. These Spot
7  Bonuses were awarded to employees who made significant impacts, and Mr.
8  Valverde received his after delivering very good results on multiple big projects.
9  Mr. Valverde's Spot Bonuses were awarded at the discretion of Adam Rose, and
10 approved by Mr. Rose's boss (Maureen Maginn, Senior VP of Deposit
11 Operations).

12     15.  The Bank awarded Mr. Valverde salary increases based on his good
13 performance reviews in about the end of 2016, mid-year 2017, and year end
14 2017. Each of these salary increases was for about 2-2.5% of his base salary.

15     16.  Mr. Valverde was also accepted into First Republic Bank's prestigious
16 year long "executive mentorship program" for 2017. The application process for
17 this program was highly competitive, and Mr. Valverde, with the support of
18 Adam Rose, was accepted along with only about 30-40 other employees out of
19 a pool of thousands of applicants. For the year long program, Mr. Valverde was
20 paired with Jared Souter as his mentor. Mr. Souter was the Bank's Chief Data
21 Officer and Deputy COO.

22     17.  Mr. Valverde's good performance was documented in his quarterly and
23 year end performance reviews. This included at least three overall "exceeds
24 expectations" ratings from Adam Rose for Mr. Valverde's quarterly performance
25 reviews during 2016 and 2017.

26     18.  Mr. Valverde's performance was not ever called into question until Q3
27 2018, shortly after he began complaining about what he reasonably believed to
28 be unlawful behavior by one of the Bank's vendors. Up until Q3 2018, all

1   discussions with Mr. Rose about Mr. Valverde's promotion to Vice President

2   were aimed towards execution in about Q1 2019.

3       19.  In about Q4 2017, First Republic Bank contracted with a vendor called

4   Finastra (hereafter also referred to as "the vendor") to deliver an enterprise

5   software application relating to payments processing for the Bank. The

6   application was a hosted, back-end platform (not customer facing). The Bank

7   had a history of working with Finastra, who already provided the Bank with a

8   similar application that was approaching capacity due to steadily increasing

9   month-over-month and year-over-year transaction volumes.

10      20.  Since First Republic Bank was outgrowing the application Finastra

11  already provided, the Bank had performed an extensive Request for Proposal

12  ("RFP"), led by Adam Rose, which resulted in awarding the service contract to

13  Finastra in Q4 2017 to provide a "newer," more robust solution. The Bank

14  selected Finastra among multiple competing vendors after completing thorough

15  reviews of requirements for each potential vendor, and based on the strength of

16  Finastra's application demo at that time. This newer application was supposed

17  to be a payment services hub that would affect every First Republic Bank

18  customer: it involved the global centralization of all payments services within

19  the Bank to support processing all types of payments through all payment

20  mechanisms.

21      21.  Johnny Valverde was included in vendor selection meetings and was on

22  the system architecture review panel. He also participated in the Bank's review

23  of requirements for each vendor who competed for the new application contract.

24  Adam Rose praised Mr. Valverde and gave him positive feedback for his

25  participation in the selection process. Based on his work for the Bank since

26  October 2014, Mr. Valverde had intimate knowledge about Finastra's original

27  application, which made him a valuable resource while selecting a vendor to

28  create the new application for the Bank.

Arbitration Complaint            - 5 -

22.  There were delays and obstructions with Finastra's new application almost as soon as First Republic Bank awarded the contract to the vendor in Q4 2017. At first, the Bank had access to the demo version of the newer application. However, shortly after awarding the contract, Finastra froze the Bank's access to the new application while allegedly performing 2017 year end maintenance.

23.  Finastra initially told the Bank it would only need about six weeks to perform this year end maintenance, and the Bank would regain access to the new application for testing and configuration in February 2018. At the end of January 2018, Finastra told the Bank that the application was not yet ready for the Bank to access, but would be soon. The vendor did not give the Bank access to the application until nearly three months later, in about late April 2018.

24.  As soon as the Bank regained access to the application in about April 2018, the Bank's Operations and IT groups began finding bugs, defects, and/or missing features and functionality in the vendor's new application while testing and configuring it. By late July and early August 2018, it became apparent that the vendor had, while offline in early 2018, rebuilt the new application into something that was much different from what the vendor had demo'd and sold to the Bank in Q4 2017.

25.  Beginning in about April 2018 and continuing through his termination in January 2019, Johnny Valverde repeatedly opposed and complained about what he reasonably perceived to be unlawful behavior by Finastra. This included complaining about behavior that violated 18 U.S. Code §1344, the Dodd-Frank Act of 2010, the Gramm-Leach-Bliley Act of 1999, the Bank Secrecy Act of 1970 (aka Anti-money Laundering Law), FDIC consent orders, as well as other statutes and regulations, or the important public policies expressed in them.

26.  Mr. Valverde repeatedly opposed and complained about Finastra's behavior that created a potential threat to the security of the Bank's customers.

1   This included complaining about the vendor's behavior that potentially exposed

2   the Bank's customers to a risk of data breach relating to personal and financial

3   information. This personal information included customers' social security

4   numbers, birth dates, addresses, and phone numbers. This financial information

5   included account numbers and payment transactions. Breach of this type of

6   data put the Bank's customers at risk for, among other things, fraud and theft

7   relating to their bank funds, and identity theft.

8       27.  From about April 2018 and continuing through July 2018, Johnny

9   Valverde repeatedly complained to his manager, Adam Rose, about the changes

10   and removals that IT and Operations were finding. During this time, Mr.

11   Valvderde met with Mr. Rose at least once every other week (on average), in

12   addition to emailing, instant messaging, and texting each other almost every

13   day. Mr. Valverde complained at least a couple of times per week (on average)

14   about the new application's various bugs, defects, and/or missing features and

15   functionality.

16       28.  Among other things, Mr. Valverde complained to Mr. Rose about the

17   application's functionality being different after the Bank regained access to the

18   application in April 2018. Mr. Valverde told Mr. Rose that, based on his

19   conversations with the IT group about the tests they were running, some of the

20   application features that were in place and working successfully in Q4 2017

21   were either changed or removed as of Q2/Q3 2018. These changes and/or

22   removals to the application were not told to the Bank or approved by the Bank

23   beforehand. These unauthorized changes/removals to the application included

24   important functions that were part of the vendor's demo pitch to the Bank, and

25   which served as the basis on which the Bank selected Finastra for its service

26   contract over other vendors.

27       29.  Examples of some of the key features and functionality which were

28   present in the Q4 2017 version of the application, but missing from the Q3/Q4

Arbitration Complaint                    - 7 -

1  2018 version, included (1) management of limits, (2) bulk load feature, (3)

2  application alerts and notifications, and (4) reporting module:

3  • Management of limits: the Q4 2017 application version allowed for

4  multi-dimensional management of user limits, payment type limits, channel

5  limits, and temporary limits. This included, for example, daily, individual,

6  payment type, volume/USD amount, and time-period limits. The Q2/Q3 2018

7  application version had almost none of this functionality, and the vendor never

8  explained why.

9  • Bulk load feature: the feature set of the application that allowed for

10  multiple payment types and larger batch files to be consumed and processed as

11  individual transactions was not available in the Q3/Q4 2018 application version,

12  but had been available in the Q4 2017 version.

13  • Application alerts and notifications: a robust feature set was included in

14  the Q4 2017 application version, but was completely non-existent in the later

15  version. This function had been a major component of the RFP vendor review

16  for both the BSA/AML, Information Security, and Compliance stakeholders.

17  • Reporting module: the Q4 2017 application version offered industry

18  leading, robust Oracle software for its reporting. Without any explanation from

19  the vendor, the Q3/Q4 2018 application version was completely missing this

20  software and had no replacement.

21  30.  The Bank was able to configure and test each of the four key features

22  identified above in the original version of Finastra's application that was

23  presented and sold to the Bank in Q4 2017. The functionality of these four key

24  features in Q4 2017 was thoroughly demonstrated, highlighted, and attested to

25  in formal RFP documents at that time. Without explanation to, or approval from,

26  that Bank, all four of these key features were missing from the vendor's Q3/Q4

27  2018 version of the application. If any of these four missing features had not

28  been included in the vendor's Q4 2017 demo, the Bank almost certainly would

Arbitration Complaint                - 8 -

1  not have awarded the service contract to the vendor.

2      31.  By late July and early August 2018, based on Mr. Valverde's
3  conversations with IT and the tests they had run, there was ample evidence
4  that Finastra had completely abandoned their prior application platform and
5  were building a new one with what was essentially an entirely different
6  ecosystem, which involved wiping away all of the Bank's prior configuration
7  work. This new product did not at all resemble the vendor's original application,
8  which had been the basis for the vendor receiving the winning contract from the
9  Bank. By that point, Mr. Valverde believed Finastra's actions regarding the new
10  application had reached the level of unlawful fraud against the Bank.

11      32.  In about early August 2018, Mr. Valverde assigned two IT employees
12  (Fred Daniels and Khash Chamlou) to test, compare, and document the changes
13  that were made by the vendor, without the Bank's knowledge, much less
14  approval, regarding (1) the original Q4 2017 demo version of the new
15  application and (2) the state of the changed application as of Q3 2018.

16      33.  In order to facilitate the two IT employees' comparison of the two
17  application versions, Mr. Valverde requested a copy of the original Q4 2017
18  contract with Finastra from Adam Rose in about August 2018, and Mr. Rose told
19  Mr. Valverde's he would "look into it." Mr. Rose never provided Mr. Valverde
20  with a copy of the contract despite Mr. Valverde asking him at least six more
21  times during the period from about August to November 2018.

22      34.  Despite Adam Rose's repeated refusal to provide a copy of the original
23  contract, Mr. Valverde was still able to direct Fred Daniels and Khash Chamlou
24  to compare and document the key differences between the Q4 2017 and Q3/Q4
25  2018 application versions: Mr. Valverde used audio recordings of the Q4 2017
26  requirements review sessions between the Bank's business stakeholders and
27  the vendor, which he had uploaded to the Project Website. These recordings
28  discuss and document many of the original features and functions of the

1  application in Q4 2017, and should still be part of the PMO Governance and First
2  Republic Bank policy, which is maintained for a minimum of 7 years.

3  35.  When the Bank awarded its service contract to Finastra, and based on
4  the Q4 2017 demo version, the discussed production launch for the application
5  was supposed to be by no later than about September 2018. However, due to
6  the numerous and significant bugs, defects, and (unauthorized) changes made
7  by the vendor to the application, its launch was pushed back to November
8  2018. After the vendor again froze the Bank's access to the application
9  beginning in about October 2018 while allegedly performing disaster recovery
10 tests, the launch date was pushed back indefinitely. The Bank was allegedly
11 going to regain access in mid-January 2019 to continue testing and
12 development of the application.

13 36.  The delays in the vendor's progress, and ultimate launch, of the new
14 application adversely affected the Bank. Among other things, the delays
15 forced the Bank to devote substantial additional resources and money while
16 employing a contingent workforce to assist the vendor with the delivery of the
17 product. As a result, the Bank far exceeded the original budget allotted for the
18 entire project.

19 37.  The vendor's extended delays also caused multiple outages and
20 disruptions to customers' services, and put the Bank at increased risk of further
21 disruptions since its products and services were already at near full operational
22 capacity at that time due to the Bank's growth.

23 38.  These adverse effects on the Bank's resources and customers, caused
24 by the vendor's delays, negatively impacted the Bank's bottom line, and in turn
25 the Bank's shareholders.

26 39.  By about late July 2018, and based on the feedback he was getting
27 from IT, including from the two IT employees' comparison of the two versions of
28 the application, Mr. Valverde was convinced that Finastra had committed fraud

1   against the Bank. This type of fraud is prohibited by 18 U.S. Code §1344 and
2   other statutes and regulations, or the important public policies expressed in
3   them.

4      40.  By no later than August 2018, there was irrefutable evidence that the
5   vendor was in the process of building a product that was much different from
6   the one it had contracted to deliver to the Bank. Mr. Valverde believed that
7   Finastra knowingly and intentionally deceived the Bank about its application,
8   including changes it made to the application's key features and functionality,
9   without the Bank's knowledge or approval.

10     41.  By late July or early August 2018, Mr. Valverde was upset and
11  concerned about what he reasonably perceived to be the vendor's unlawful
12  conduct. Based on the number of problems regarding the application at that
13  time, he believed Finastra's application was potentially years away from being
14  ready to launch, if it would ever be ready. Mr. Valverde was concerned about
15  the increased costs to the Bank because of these ongoing delays.

16     42.  Mr. Valverde was also concerned about operational risks if the
17  application did not function properly: since the application would manage and
18  move money for the Bank's customers, the vendor's malfunctioning application
19  could potentially create risks like, for example, losing customers' payments or
20  sending money to the wrong person. This would in turn create the risk of
21  lawsuits and/or federal sanctions against First Republic Bank.

22     43.  Based on his reasonable concerns about the vendor's unlawful behavior
23  and the potential risk it created for the Bank, its customers, and its
24  shareholders, Johnny Valverde began escalating the seriousness and urgency of
25  his complaints to Adam Rose beginning in about late July or early August 2018.
26  On at least about half a dozen separate occasions in August 2018, Mr. Valverde
27  used the terms "fraud" while complaining to Mr. Rose about the application's
28  bugs, defects, and missing features and functionality. About half of these

1   complaints were verbal, while the others occurred during texts or instant

2   messages between Mr. Valverde and Mr. Rose.

3       44.  During the course of their texting and instant messaging, whenever Mr.

4   Valverde's complaints about the vendor's behavior veered into mentioning

5   potential liability for the Bank, Mr. Rose quickly called him. It was clear to Mr.

6   Valverde that Adam Rose did not want to discuss that topic in writing.

7       45.  During his August 2018 complaints to Mr. Rose, Johnny Valverde

8   referred to Finastra's behavior as a "bait and switch," meaning they sold the

9   Bank on one version of its application, but were actually building an application

10  that was very different from the one for which they received a contract.

11      46.  On about the morning of September 5, 2018, Mr. Valverde informed

12  Adam Rose that he had the two IT employees testing and comparing the Q4

13  2017 application version versus the Q3 2018 version. Mr. Valverde once again

14  stated his belief that Finastra was committing fraud against the Bank.

15      47.  Just nine days later on September 14, 2018, and without any prior

16  warning, Adam Rose issued Johnny Valverde a Performance Improvement Plan

17  ("PIP") and negative performance review that was purportedly retroactive for

18  Q1/Q2 2018, even though mid-year performance reviews were typically

19  completed and issued by late July.

20      48.  In about late July or early August 2018, right around the time when Mr.

21  Valverde began escalating his complaints about the vendor's unlawful behavior,

22  Adam Rose transferred ownership of about 12-14 Finastra "compliance

23  exceptions" to Johnny Valverde. Each of these exceptions was a specific issue

24  for which the vendor had failed to comply with, including, for example: FDIC,

25  OCC, or SEC consent orders; First Republic Bank's Information Security polices

26  and standards; and attestation to the Bank's vendor management policies and

27  standards.

28      49.  These 12-14 compliance exceptions were all "aging" (i.e., 1-2 years

1  old) and urgently needed resolution. Finastra's ongoing failure to resolve these
2  compliance exceptions created a risk of violating the Gramm-Leach-Bliley Act
3  of 1999, the Dodd-Frank Act of 2010, and/or the Bank Secrecy Act of 1970,
4  FDIC consent orders, as well as other statutes and regulations, or the
5  important public policies expressed in them.

6  　　50.  The vendor's failure to address and resolve these compliance
7  exceptions also created a risk for the security of the Bank's customers. This
8  included, among other things, potentially exposing customers to the risk of
9  data breach relating to personal and financial information. This personal
10  information included customers' social security numbers, birth dates,
11  addresses, and phone numbers. This financial information included account
12  numbers and payment transactions. Breach of this type of data put
13  customers' at risk for, among other things, fraud and theft relating to their
14  bank funds, and identity theft.

15  　　51.  Adam Rose never told Johnny Valverde that he assigned Mr. Valverde
16  ownership of the 12-14 aging Finastra compliance exceptions: Mr. Valverde
17  learned about it from Rebecca Levy, who worked in the Bank's Audit and
18  Compliance group. Mr. Valverde had never been assigned ownership of any
19  other compliance exceptions in his prior two years of employment with the
20  Bank. Mr. Rose owned those 12-14 aging compliance exceptions before he
21  transferred them to Mr. Valverde, and Mr. Rose never gave him any explanation
22  regarding why Mr. Rose transferred ownership to Mr. Valverde.

23  　　52.  After he was assigned ownership of the compliance exceptions, Mr.
24  Valverde immediately and repeatedly tried to get Finastra to address the
25  compliance exceptions, but his ongoing efforts were fruitless. The vendor, who
26  had not provided any updates on the exceptions for months before Mr. Valverde
27  was assigned ownership, was non-responsive.

28  　　53.  During this time period, Johnny Valverde repeatedly communicated to

Arbitration Complaint　　　　　　- 13 -

Adam Rose his concerns about Finastra's non-responsiveness and its failure to address and remedy these compliance exceptions. Finastra had already been flagged and sanctioned by the FCC for various prior non-compliance and was considered a high risk vendor. Since the vendor was not responding to Mr. Valverde, he asked Mr. Rose to escalate the issue to Finastra himself since Mr. Rose had more authority within the Bank. Mr. Valverde mentioned/requested escalation of the compliance exceptions to Mr. Rose at least a dozen times from August to November 2018, including verbally and in emails. During at least a few of these communications, Mr. Valverde mentioned his specific concerns about the potential for customer data/security breaches and federal regulatory punishment.

54.   Whenever Mr. Valverde mentioned the need to escalate the urgency of compliance exceptions to Finastra, Mr. Rose avoided or postponed discussion of the issue. Mr. Rose either blew it off like, for example, telling Mr. Valverde he would get to it later or they would discuss it later, or Mr. Rose simply ignored or changed the subject. Mr. Valverde tried to put the issue of Finastra's compliance exceptions on the meeting agenda for the vendor's on-site visit in October 2018, but Mr. Rose refused to do so and never set a date to discuss the issue with Finastra.

55.   By October 2018, Mr. Valverde was meeting with the Rebecca Levy at least once per month to discuss vendor updates. In about early November 2018, Mr. Valverde asked Ms. Levy to include Adam Rose in their audit and compliance meetings. Despite Mr. Valverde's request, Mr. Rose was a "no show" for the two meetings Mr. Valverde and Ms. Levy had in November and December 2018, and then Mr. Rose fired Mr. Valverde on January 8, 2019.

56.   In about early July 2018, Adam Rose tried to get the project leads to agree to an email status update to his manager, Maureen Maginn (a Senior VP) and Jason Bender (an Executive VP). The email update that Mr. Rose had

drafted was intentionally deceptive, if not outright false, and claimed the
vendor's application was progressing well and delivery dates were on track, etc.
When Mr. Valverde read the proposed email update, he replied to everyone on
the email thread and said that he was not comfortable with putting his name on
that email, and asked to excluded from it.

57. In about late July or August 2018, Brandi Speed, who had been hired
by the Bank to help shore up vendor compliance, asked Johnny Valverde to
submit a formal document updating information about Finastra, including an
"exit strategy." Mr. Valverde completed and submitted a template providing
details about how the Bank should implement a separation of services and
transition plan (including selecting alternate vendors) in case the Bank needed
to terminate its service contract with Finastra. Mr. Valverde's exit strategy
addressed scenarios for a host of potential reasons to terminate the vendor's
contract, including but not limited to: reputational damage, the sudden failure
of applications, violation of contract, and legal action against the vendor.

58. In order to facilitate the completion of this exit strategy document, Mr.
Valverde requested (verbally or in writing) a copy of the original vendor
contract from Mr. Rose at least a few times during about late July to October
2018. Mr. Rose never provided a copy of the contract to Mr. Valverde.

59. After Johnny Valverde submitted his completed exit strategy for
Finastra in mid-to-late August 2018, portions of his document were used by the
Bank's Vendor Management group and Information Security group. Various
members of these two groups thanked Mr. Valverde for his thorough and
"impressive" work on the exit strategy document.

60. Adam Rose did not express any appreciation whatsoever for Mr.
Valverde's efforts on the exit strategy. Shortly after Mr. Valverde finished and
submitted his exit strategy document in August 2018, Mr. Rose pulled Mr.
Valverde into his office. Mr. Rose asked Mr. Valverde, "did you really need to go

1 | into so much detail on the exit strategy?" Mr. Rose then instructed Mr. Valverde
2 | not to bring up the exit strategy to the project team and to give Mr. Rose
3 | everything he had been working on regarding the exit strategy.

4 | 61. During August 2018, Mr. Valverde began suggesting to Mr. Rose that
5 | they should consider using an exit strategy with Finastra and using one of the
6 | alternate vendor's solutions. Between early August and early September 2018,
7 | Mr. Valverde raised the subject of using an exit strategy for the vendor at least
8 | about a half a dozen times with Mr. Rose. Mr. Valverde communicated with two
9 | alternate vendors (one via email, one verbally) during that time about
10 | potentially taking over the application. By November or December 2018, Mr.
11 | Valverde told Mr. Rose that changing vendors was a viable option.

12 | 62. After Adam Rose gave Johnny Valverde the PIP and negative "mid-
13 | year" performance review in mid-September 2018, Mr. Valverde feared for his
14 | job and was more reluctant to criticize Finastra's unlawful behavior. Mr.
15 | Valverde believed he could not just drop the issue entirely, so he initiated at
16 | least a couple of conversations with Mr. Rose in November, and then a couple
17 | more conversations with Mr. Rose in December, during which Mr. Valverde
18 | brought up the subject of Finastra's fraud against the Bank, and the vendor's
19 | failure to address and resolve compliance exceptions (and thereby potentially
20 | exposing the Bank's customers to security risks). Each time Mr. Valverde raised
21 | any of these subjects, Mr. Rose blew it off, told him they would discuss it later,
22 | or accused Mr. Valverde of being "melodramatic."

23 | 63. Johnny Valverde also complained about Finastra's unlawful behavior
24 | during project leadership meetings on average at least once per month between
25 | about April through December 2018. These meetings typically included Mr.
26 | Valverde, Adam Rose, Santino Failla (Lead Program Manager), Maria Lorico
27 | (Senior Project Manager), Donna Sandoval (Director of IT-QA), and Churni
28 | Bhattacharya (VP of IT). Mr. Valverde was the only member of the project

1  leadership team who raised the issue during these meetings.

2  64. During at least three of these meetings when most, if not all, of the

3  project leadership was in attendance (either in one room or on a call), Mr.

4  Valverde referred to Finastra's behavior as "fraud."

5  65. During multiple project leadership meetings, Mr. Valverde stated his

6  opinion that the vendor was 1 to 3 years away from a complete and successful

7  production launch given the delays, bugs, and "bait and switch" scenario that

8  became increasingly obvious during Q3 2018.

9  66. During one of these project leadership meetings in about early-to-mid

10 November 2018, Mr. Valverde complained about the fact that the vendor was

11 using a third party hosted application instead of a natively hosted reporting

12 tool, which is what the vendor had been using in Q4 2017 and was required by

13 the RFP. Mr. Valverde called Finastra's use of the third party hosted application

14 "a clear breach of contract" and openly requested, from Adam Rose, a copy of

15 the original contract between the Bank and Finastra. In response, Mr. Rose

16 claimed they would address the issue "next meeting." Mr. Rose never provided

17 Mr. Valverde with a copy of the original contract.

18 67. Once it became clear to Johnny Valverde that Adam Rose was

19 passively, if not proactively, enabling Finastra's unlawful behavior, Mr. Valverde

20 submitted an online complaint to a third party whistleblowing group (via the

21 Bank's intranet portal) in about late October or early November 2018. In his

22 written complaint to this whistleblowing group, Mr. Valverde identified his

23 concerns about the following issues, among other things:

24 • Adam Rose's ongoing pattern of deceptive behavior while acting on behalf

25    of Finastra;

26 • repeated questions raised by colleagues about this vendor and Mr. Rose's

27    apparent disregard for related risks and issues;

28 • verifiable evidence showing the vendor's intentional fraud against the

1   Bank; and

2   • being set up by Mr. Rose to take the blame for potential failure of the
3   application and resolution of compliance exceptions, which created a risk
4   of exposing the Bank's customers to security breaches and/or violating
5   the Gramm-Leach-Bliley Act of 1999, the Dodd-Frank Act of 2010, the
6   Bank Secrecy Act of 1970, FDIC consent orders, and other statutes and
7   regulations, or important public policies expressed in them.

8   68.  During about the early afternoon of January 8, 2019, Johnny Valverde
9   sent an email to the Bank's legal general counsel expressing the same concerns
10  he identified in his written complaint to the third party whistleblowing group.
11  Mr. Valverde was informed of his termination later that same day.

12  69.  After Johnny Valverde escalated his complaints about Finastra in about
13  late July 2018 and began calling out the vendor's unlawful actions and failure to
14  comply with Bank and federal regulations and policies, Adam Rose engaged in a
15  pattern of retaliatory behavior against Mr. Valverde. On information and belief,
16  Mr. Rose's behavior was designed to either push Mr. Valverde out of the Bank or
17  set him up to take the blame for any adverse results potentially suffered by the
18  Bank because of the vendor's actions.

19  70.  After Mr. Valverde began complaining about Finastra's unlawful
20  behavior, Mr. Rose did all of the following:

21  • Mr. Rose assigned Mr. Valverde 12-14 aging compliance exceptions,
22  • Mr. Rose issued Mr. Valverde an unmerited PIP and negative mid-year
23  2018 performance review,
24  • Mr. Rose excluded Mr. Valverde from vendor meetings,
25  • Mr. Rose excluded Mr. Valverde from project team meetings,
26  • Mr. Rose stopped meeting with Mr. Valverde 1 on 1 after issuing the PIP,
27  • Mr. Rose delayed hiring direct reports for Mr. Valverde, and
28  • Mr. Rose abruptly terminated Mr. Valverde.

Arbitration Complaint                    - 18 -

71.  In about late July or early August 2018, Adam Rose assigned Mr. Valverde ownership of 12-14 aging compliance exceptions for Finastra that Mr. Rose had owned up until that point. Mr. Rose did so without even telling Mr. Valverde about this change in ownership, and without ever previously assigning Mr. Valverde any compliance exceptions. Mr. Rose then refused to provide Mr. Valverde with a copy of the Q4 2017 vendor contract, despite Mr. Valverde's repeated requests.

72.  On September 14, 2018, about nine days after Johnny Valverde informed Adam Rose he had assigned two IT employees to track discrepancies between the Q4 2017 and Q3 2018 versions of the application, Mr. Rose issued Mr. Valverde an unmerited negative mid-year 2018 performance review and an accompanying unmerited PIP. The negative review cost Mr. Valverde his quarterly bonus and about a 6% year end annual salary increase.

73.  The Bank's mid-year reviews were typically issued to employees by no later than late July. Mr. Valverde had completed and submitted his self-evaluation and the reviews of his direct reports to Mr. Rose by about early or mid July 2018. Mr.  Valverde asked Mr. Rose about the status of his performance review at least six times during late July and August 2018, including via instant message, text, and verbally. Adam Rose admitted to Mr. Valverde that the review was late but never gave any explanation why he waited so long to complete it. On information and belief, after Mr. Valverde talked with his peers, he was the only one of Mr. Rose's reports who received their 2018 mid-year review so late.

74.  Johnny Valverde had a particular interest in receiving his mid-year review and presumed Q2 2018 bonus (like he had received in each prior quarter since Q4 2016) since he was planning to take some time off to visit his father, who had cancer and was undergoing chemotherapy in Houston, in about September or October 2018. Adam Rose knew about Mr. Valverde's father and

1   Mr. Valverde's plans to visit his father that fall since Mr. Valverde had talked

2   with Mr. Rose about it at least six times during the prior three months. After Mr.

3   Rose issued the negative performance review and PIP, Mr. Valverde felt

4   compelled to stay and work, so he cancelled his visit with his father for fear of

5   losing his job.

6       75.   After reading the performance review and PIP, Mr. Valverde

7   immediately expressed to Mr. Rose his strong disagreement with the

8   assessment and allegations. Mr. Valverde argued that much of what was stated

9   in the review and PIP was inaccurate, and he disputed the various allegations.

10      76.   There was no HR representative present when Mr. Rose delivered the

11  negative mid-year performance review and PIP to Mr. Valverde, and no HR rep

12  ever signed the PIP. Mr. Rose previously told Mr. Valverde, while discussing two

13  of his colleagues' negative performance reviews, that there was supposed to be

14  a HR representative present whenever an employee receives an overall rating of

15  "needs improvement."

16      77.   Beginning in about September 2018, Mr. Rose started excluding Johnny

17  Valverde from project meetings that were relevant to his job duties. This

18  included, but was not limited to, excluding Mr. Valverde from the following:

19      • a project leadership meeting in September or October 2018 about the

20          terms of the contract with Finastra (Mr. Valverde later found out about

21          this meeting in about November 2018);

22      • an audit and compliance meeting in about early-to-mid October 2018 (Mr.

23          Valverde found out about this meeting from Khash Chamlou in about late

24          October or early November); and

25      • a regulatory meeting about the application project in late September

26          2018 (Mr. Valverde was later told by Margaret, the project coordinator,

27          that Mr. Rose had expressly asked her not to include Mr. Valverde on the

28          invite list).

78. Mr. Valverde confronted Mr. Rose (verbally or via email/text) at least about half a dozen times in October and November 2018 about being excluded from meetings to which he should have been invited. Mr. Valverde also mentioned being excluded from meetings by Mr. Rose in his written complaints to the third party whistleblower group and to general counsel.

79. Before Mr. Valverde began escalating his complaints about Finastra in late July or early August 2018, he had meetings with the vendor and Adam Rose at least about once every two weeks. Then, starting in about late August 2018 or early September 2018, Mr. Rose began excluding Mr. Valverde from these vendor meetings and limiting Mr. Valverde's direct access to the vendor. Mr. Rose excluded Mr. Valverde from meetings with the vendor about action items that Mr. Valverde owned, and which were mentioned in the PIP. Mr. Valverde would hear about these meetings after the fact, and estimates that he was excluded from at least half a dozen such meetings.

80. Johnny Valverde did not have any more 1 on 1 meetings with Adam Rose after Mr. Rose issued him the unmerited PIP in mid-September 2018. Before the PIP, Mr. Valverde met with Mr. Rose 1 on 1 at least about once every two weeks, but typically once per week, either in person or on the phone. After the PIP, Mr. Rose always invited Santino Failla to Mr. Rose's normally scheduled 1 on 1 meetings along with Mr. Valverde.

81. After Johnny Valverde began complaining about Finastra's unlawful behavior and non-compliance during early Q3 2018, Adam Rose failed to deliver either of the two direct reports he had previously promised to Mr. Valverde. One of these direct reports was going to be a replacement for an employee who left in about March 2018. During July and August 2018, at least six candidates were forwarded from HR to Mr. Valverde to review, and Mr. Valverde approved at least three of the candidates. The ball was then in Mr. Rose's court to approve or reject the direct hire candidates, but Mr. Rose did not take any action. HR

1   contacted Mr. Valverde about it, and Mr. Valverde reached out to Mr. Rose at

2   least six times, but no candidate was ever approved and the delays caused

3   those candidates to seek work elsewhere.

4       82.  The other direct report was supposed to be a new hire, and Adam Rose

5   had promised Mr. Valverde this new hire since about Q4 2017. Then, in Q3

6   2018, Mr. Rose told Mr. Valverde that he would not get the new hire due to

7   alleged budget restrictions. Mr. Valverde later learned, during a project meeting

8   in about November 2018, that this was not true and the project budget was not

9   yet set as of Q3 2018. When Mr. Rose informed Mr. Valverde that he would not

10  get a new hire, Mr. Rose instead offered him an internal employee who worked

11  in the call center support group and was a documented poor performer, and

12  who was completely unqualified to support Mr. Valverde.

13      83.  The alleged criticisms set forth by Adam Rose in Johnny Valverde's

14  mid-year 2018 performance review and accompanying PIP, and in Mr. Rose's

15  January 3, 2019 email to Jennifer Leung about terminating Mr. Valverde,

16  were just a pretext to punish Mr. Valverde for opposing unlawful behavior by

17  the vendor and by Mr. Rose. Mr. Valverde will show pretext since, among

18  other things:

19      • these criticisms cite inaccuracies and mischaracterizations about Mr.

20        Valverde's job role and responsibilities,

21      • they fail to mention or take into account the numerous steps taken by

22        Mr. Rose to prevent Mr. Valverde from performing his job duties,

23        including eliminating his 1 on 1 meetings and excluding him from

24        vendor and team meetings,

25      • Mr. Rose repeatedly sided with the vendor, refusing to acknowledge

26        the vendor's role in preventing Mr. Valverde to resolve key issues like

27        compliance exceptions, and

28      • there was no involvement or guidance from HR regarding the PIP

1
2

- Mr. Valverde's colleagues (Brandi Speed and Adam Schlesinger) did not in fact complain about his performance.

3
4
5
6
7
8
9
10

84.  On January 8, 2019, Johnny Valverde was abruptly terminated by Adam Rose via phone call. The termination took place without any prior warning: Mr. Valverde was under the impression he was dialing into his bi-weekly meeting with Mr. Rose. After he was informed of the termination and Mr. Rose was off the call line, Mr. Valverde spoke with the HR representative who was also on the call. The HR rep apologized to Mr. Valverde and told him she only found out about his termination the day before, and that she was not aware that Mr. Valverde had been issued a PIP.

11
12
13
14
15
16
17
18

85.  Johnny Valverde does not know whether the Bank ever performed any investigation regarding his separate complaints to the third party whistleblowing group or to the Bank's general counsel. On January 23, 2019, about 15 days after Johnny Valverde was abruptly discharged, Jennifer Leung (Vice President, HR Business Partner for First Republic Bank) emailed Mr. Valverde about potentially meeting with "two individuals from our Internal Fraud team." Mr. Valverde never heard from those two individuals and does not know whether it was related to his complaints about Adam Rose and Finastra.

19
20
21
22

86.  This arbitration complaint is timely filed under California Courts' COVID-19 Emergency Rule 9, which tolled the statutes of limitations for civil causes of actions that exceed 180 days from April 6, 2020 until October 1, 2020 (178 calendar days).

23

**FIRST CAUSE OF ACTION**

24

**Retaliation in Violation of Labor Code §1102.5**

25
26
27

As a first, separate and distinct cause of action, Complainant Johnny Valverde complains against Respondents First Republic Bank, Inc. and Does 1-5, 11-15, and each of them, and for a cause of action alleges:

28

87.  Complainant hereby incorporates by reference Paragraphs 1 through

1    86, inclusive, as though set forth here in full.

2      88.  Respondents First Republic Bank, and Does 1-5, 11-15, and each of

3    them, violated California Labor Code section 1102.5 by retaliating against

4    Complainant Johnny Valverde because he opposed what he reasonably believed

5    to be unlawful fraud and regulatory non-compliance by a Bank vendor

6    (Finastra), and/or because he opposed his manager's role in the vendor's

7    unlawful behavior, and/or because respondents believed Mr. Valverde might

8    participate in a future administrative or civil proceeding regarding those alleged

9    violations.

10      89.  Mr. Valverde's opposition to what he reasonably believed to be unlawful

11    fraud against the Bank and regulatory non-compliance included, but was not

12    limited to, the following:

13      • repeatedly and continuously complaining to his manager about the

14        vendor's fraudulent behavior from about April 2018 up to his termination;

15      • repeatedly and continuously complaining to his manager about the

16        vendor's failure to resolve compliance exceptions, which risked exposing

17        the Bank's customers to security and data breaches and risked violation

18        of numerous federal laws and regulations;

19      • refusing to sign off on an email, which would be sent to a Senior VP and

20        an Executive VP with the Bank, that was intentionally deceptive regarding

21        the vendor's application progress and updates;

22      • submitting a written complaint in about October or November 2018 to a

23        third party whistleblowing group via the Bank's intranet; and

24      • sending an email complaint on about January 8, 2019 to the Bank's

25        general counsel.

26      90.  The unlawful behavior opposed and complained about by Mr. Valverde

27    violated, or risked violating, 18 U.S. Code §1344, the Gramm-Leach-Bliley Act

28    of 1999, the Dodd-Frank Act of 2010, the Bank Secrecy Act of 1970, FDIC

1   consent orders, as well as  other statutes and regulations, or the important

2   public policies expressed in them.

3      91.  Respondents First Republic Bank, and Does 1-5, 11-15, and each of

4   them, engaged in adverse and retaliatory actions against Mr. Valverde that

5   included, but was not limited to, the following:

6     • Mr. Rose assigned Mr. Valverde 12-14 aging compliance exceptions,

7     • Mr. Rose issued Mr. Valverde an unmerited PIP and negative mid-year

8       2018 performance review,

9     • Mr. Rose excluded Mr. Valverde from key vendor meetings,

10     • Mr. Rose excluded Mr. Valverde from key project team meetings,

11     • Mr. Rose did not meet with Mr. Valverde 1 on 1 after issuing the PIP,

12     • Mr. Rose delayed the hiring of two direct reports for Mr. Valverde, and

13     • Mr. Rose abruptly terminated Mr. Valverde on January 8, 2019.

14      92.  As a legal result of Respondents' retaliation in violation of Labor Code

15   §1102.5, Mr. Valverde suffered and continues to suffer substantial losses in past

16   and future earnings and other employee benefits. Complainant will seek leave

17   to amend this complaint to state the amount or will proceed according to proof

18   in arbitration.

19      93.  Respondents First Republic Bank and Does 1-5, 11-15 were in a

20   position of power over Complainant with the potential to abuse that power. Mr.

21   Valverde was in a vulnerable position because of his relative lack of power,

22   because of his reliance on Respondents' assurances, because he had placed his

23   trust in Respondents, because he depended on his employment for his self

24   esteem and sense of belonging, because a wrongful termination of his

25   employment would likely harm Complainant's ability to find other employment,

26   and because of the great disparity in bargaining power between Complainant

27   and his employer. These Respondents were aware of Complainant's vulnerability

28   and the reasons for it.

Arbitration Complaint         - 25 -

94.  Notwithstanding such knowledge, these Respondents, and each of them, acted oppressively, fraudulently, and maliciously, in willful and conscious disregard of the rights of Complainant Johnny Valverde, and with the intention of causing or in reckless disregard of the probability of causing injury and emotional distress to him.

95.  These Respondents were informed of the oppressive, fraudulent and malicious conduct of their employees, agents and subordinates, and ratified, approved, and authorized that conduct.

96.  The foregoing conduct of these Respondents, and each of them, was intentional, willful and malicious and Complainant is entitled to punitive damages in an amount to conform to proof.

## SECOND CAUSE OF ACTION

### Discharge in Violation of Public Policy

As a second, separate and distinct cause of action, Complainant Johnny Valverde complains against Respondents First Republic Bank and Does 1, 5, 11, 15, 20-25, and each of them, and for a cause of action alleges:

97.  Complainant hereby incorporates by reference Paragraphs 1 through 96, inclusive, as though set forth here in full.

98.  Respondents discharged Johnny Valverde in violation of the public policy prohibiting retaliation for whistleblowing, as set forth by California Labor Code §1102.5.

99.  Respondents discharged Johnny Valverde in violation of the public policy set forth in 18 U.S. Code §1344, the Gramm-Leach-Bliley Act of 1999, the Dodd-Frank Act of 2010, the Bank Secrecy Act of 1970, and FDIC consent orders.

100.  As a legal result of his wrongful discharge in violation of public policy by Respondents First Republic Bank and Does 1, 5, 11, 15, 20-25, Complainant suffered and continues to suffer substantial losses in past and future earnings

1  and other employee benefits. Complainant will seek leave to amend this
2  complaint to state the amount or will proceed according to proof in arbitration.

3      101.  Complainant suffered and continues to suffer emotional distress as a
4  legal result of his wrongful discharge by Respondents First Republic Bank and
5  Does 1, 5, 11, 15, 20-25. Mr. Valverde suffered mental distress, suffering and
6  anguish as a legal result of Respondents' conduct, reacting to his discharge with
7  humiliation, embarrassment, anger, outrage, disappointment, and worry, all of
8  which is substantial and enduring. Complainant will seek leave to amend this
9  complaint to state the amount or will proceed according to proof in arbitration.

10      102.  Respondents First Republic Bank and Does 1, 5, 11, 15, 20-25 were in
11  a position of power over Complainant with the potential to abuse that power.
12  Mr. Valverde was in a vulnerable position because of his relative lack of power,
13  because of his reliance on Respondents' assurances, because he had placed his
14  trust in Respondents, because he depended on his employment for his self
15  esteem and sense of belonging, because a wrongful termination of his
16  employment would likely harm Complainant's ability to find other employment,
17  and because of the great disparity in bargaining power between Complainant
18  and his employer. These Respondents were aware of Complainant's vulnerability
19  and the reasons for it.

20      103.  Notwithstanding such knowledge, these Respondents, and each of
21  them, acted oppressively, fraudulently, and maliciously, in willful and conscious
22  disregard of the rights of Complainant Johnny Valverde, and with the intention
23  of causing or in reckless disregard of the probability of causing injury and
24  emotional distress to him.

25      104.  These Respondents were informed of the oppressive, fraudulent and
26  malicious conduct of their employees, agents and subordinates, and ratified,
27  approved, and authorized that conduct.

28      105.  The foregoing conduct of these Respondents, and each of them, was

1  intentional, willful and malicious and Complainant is entitled to punitive
2  damages in an amount to conform to proof.

3  **PRAYER**

4     Wherefore Complainant Johnny Valverde prays for judgment against
5  Respondents, and each of them, as follows:

6     1.  For a money judgment representing compensatory damages including
7  lost wages and earnings, retirement benefits and other employee benefits, lost
8  earning capacity, and all other sums of money, together with interest on these
9  amounts, according to proof;

10     2.  For a money judgment for mental pain and anguish and emotional
11  distress, according to proof;

12     3.  For a money judgment for punitive damages, according to proof;

13     4.  For monetary civil penalties pursuant to California Labor Code
14  §1102.5(f), according to proof;

15     5.  For prejudgment and post-judgment interest;

16     6.  For attorney fees pursuant to California Labor Code §1102.5(j), and any
17  other appropriate legal authority;

18     7.  For costs of suit; and

19     8.  For any other relief that is just and proper.

20  Dated: July 6, 2021                    LAW OFFICES OF PHIL HOROWITZ

21

22                                  by    *Phil Horowitz*

23                                       Phil Horowitz
                                         Attorneys for Complainant
24                                       Johnny Valverde

25

26

27

28

Arbitration Complaint               - 28 -

# EXHIBIT B

1    SEYFARTH SHAW LLP
     Brian T. Ashe (SBN 139999)
2    bashe@seyfarth.com
     Bailey K. Bifoss (SBN 278392)
3    bbifoss@seyfarth.com
     560 Mission Street, 31st Floor
4    San Francisco, California 94105
     Telephone:    (415) 397-2823
5    Facsimile:    (415) 397-8549

6    Attorneys for Respondent
     FIRST REPUBLIC BANK
7

8

9                    AMERICAN ARBITRATION ASSOCIATION

10

11   JOHNNY VALVERDE, an individual            Case No.: 01-21-0004-6377

12              Claimant,                       **RESPONDENT'S ANSWER AND
                                                AFFIRMATIVE DEFENSES IN
13         v.                                   RESPONSE TO CLAIMANT JOHNNY
                                                VALVERDE'S DEMAND FOR
14   FIRST REPUBLIC BANK; and DOES 1 to 20,     ARBITRATION**
     inclusive,
15
                Respondents.
16

17

18

19

20

21

22

23

24

25

26

27

28

────────────────────────────────────────────────────
     RESPONDENT'S ANSWER TO CLAIMANT'S DEMAND; CASE NO.: 01-21-0004-6377

74932702v.1

Respondent First Republic Bank answers the Demand for Arbitration of Claimant Johnny Valverde as follows:

## GENERAL DENIAL

First Republic denies each allegation and each purported claim in the Demand and, without limiting the generality of the foregoing, denies that Valverde has been damaged in any amount, or at all, by any reason of any acts or omissions of the Bank.

## SEPARATE AND DISTINCT AFFIRMATIVE AND OTHER DEFENSES

In further answer to the Demand, First Republic alleges the following affirmative and other defenses. In asserting these defenses, FRB does not assume the burden of proof as to matters that, pursuant to law, are Valverde's burden to prove.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

The Demand and each and every cause of action stated in it fails to state a claim for which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

Valverde failed to mitigate his alleged damages and, therefore, is precluded from recovering those alleged damages.  The Bank is informed and believes that, at all relevant times, employment substantially similar to the former job held by Valverde has been available to him, and yet he wants FRB to pay him for being out of work (or receiving less pay for his new position). The Bank is informed and believes that Valverde failed to make reasonable efforts to seek and retain this comparable employment.

## THIRD AFFIRMATIVE DEFENSE

### (Failure to Exhaust)

Valverde's claims are barred in whole or in part because he failed to exhaust his administrative remedies or to comply with the statutory prerequisites for bringing this Demand.

1

RESPONDENT'S ANSWER TO CLAIMANT'S DEMAND; CASE NO.: 01-21-0004-6377

74932702v.1

## FOURTH AFFIRMATIVE DEFENSE

### (Legitimate Business Justification/Mixed Motive)

Any recovery on Valverde's Demand, or any purported cause of action alleged in it, is barred under the mixed motive affirmative defense. Assuming, *arguendo*, that retaliatory reasons had been a motivating factor in the Bank's decisions toward Valverde, which FRB expressly denies, FRB would have made the same decisions for legitimate, non-retaliatory business reasons.

## FIFTH AFFIRMATIVE DEFENSE

### (Legitimate Reasons)

Valverde's claims are barred in whole or in part because the alleged treatment complained of, if it occurred, was privileged, justified, and based on legitimate, non-retaliatory reasons.

## SIXTH AFFIRMATIVE DEFENSE

### (Good Faith/Cause)

Valverde's claims are barred in whole or in part because the actions of First Republic with respect to him were done in good faith and/or in a manner consistent with business necessity and with good cause.

## SEVENTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

Valverde's claims are barred in whole or in part by all applicable statutes of limitations, including, but not limited to, California Code of Civil Procedure sections 335.1 and 338.

## EIGHTH AFFIRMATIVE DEFENSE

### (Policy Against Retaliation)

Valverde may not recover punitive damages because, at all times relevant to the Demand, FRB had a policy in place to prevent retaliation in the workplace, and the Bank made good faith efforts to implement and enforce that policy.

## NINTH AFFIRMATIVE DEFENSE

### (Workers' Compensation Preemption)

Because Valverde seeks recovery for alleged emotional and/or physical injury based on alleged conduct by FRB that neither contravenes fundamental California public policy nor exceeds the risks

2

1    inherent in the employment relationship, he should have brought a claim for workers' compensation
2    benefits instead of his claims in arbitration.  Any recovery made on that basis is barred by the exclusive
3    remedy of the California Workers' Compensation Act.  Cal. Lab. Code § 3200, *et seq.*

### TENTH AFFIRMATIVE DEFENSE

### (Failure to Take Advantage of Preventive/Corrective Opportunities)

FRB exercised reasonable care to prevent and/or correct any unlawful retaliatory workplace
conduct allegedly experienced by Valverde.  He unreasonably failed to take advantage of any preventive
or corrective opportunities provided by the Bank or to avoid harm otherwise, and so his claims are
barred or, alternatively, his relief is limited.

### ELEVENTH AFFIRMATIVE DEFENSE

### (Scope of Authority)

First Republic Bank cannot be held vicariously liable for the conduct alleged in Valverde's
Demand to the extent such conduct was outside the course and scope of employment of the individual(s)
who allegedly engaged in such conduct.

### TWELFTH AFFIRMATIVE DEFENSE

### (After-Acquired Evidence)

Valverde's respective claims are barred or his damages, if any, are limited to the extent he
engaged in any fraud that induced FRB to enter into any employment relationship with him or engaged
in any behavior of which FRB was unaware until after his separation of employment, which could serve
as an independent basis for termination.

### THIRTEENTH AFFIRMATIVE DEFENSE

### (Offset)

Any recovery on the Demand, or any purported cause of action alleged in it, is barred in whole or
in part under the doctrine prohibiting double recovery.  First Republic is entitled to an offset for any
monies Valverde received from any source after he ceased to work for the Bank. The Bank is thereby
entitled to an offset for any benefits Valverde receives or has received from workers' compensation,
unemployment compensation, or from any benefit plans of FRB or others, for injuries or damages
alleged in the Demand, against any award of damages to Valverde.

3

74932702v.1

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Contribution by Valverde's Own Acts)

The Demand, and each purported cause of action alleged in it, is barred because any injuries and/or alleged damages were proximately caused by and/or contributed to by the acts, omissions, and/or failure to act by Valverde.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Failure to Comply with Employer Instructions)

Valverde's Demand, and each cause of action in it, is barred to the extent that he failed to comply with the directions of FRB concerning the services for which he was engaged.  Cal. Lab. Code § 2856.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Estoppel)

Any recovery on the Demand, or any purported cause of action alleged in it, is barred to the extent Valverde is estopped by his own conduct and actions from claiming any right to damages or any relief against First Republic Bank.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Consent & Waiver)

Any recovery on the Demand, or any purported cause of action alleged in it, is barred by the doctrines of consent and waiver as applied to Valverde.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

Any recovery on the Demand, or any purported cause of action alleged in it, is barred by the equitable doctrine of unclean hands to the extent it is shown that Valverde acted unethically or in bad faith with respect to the subject of the Demand.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Release)

Valverde's claims are barred in whole or in part to the extent that he is determined to have released any of them.

4

74932702v.1

## TWENTIETH AFFIRMATIVE DEFENSE

### (Laches)

Valverde delayed unreasonably in filing and/or pursuing this action, causing prejudice to FRB and, thus, his claims are barred by the equitable doctrine of laches.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Privilege)

Valverde's claims are barred in whole or in part because First Republic's conduct was privileged. Where an employer in good faith seeks to protect its own self-interest to ascertain whether an employee has breached his responsibilities of employment, such conduct is privileged even if it is substantially certain emotional distress will result from the employer's conduct.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (*Kolstad* Defense)

Valverde may not recover punitive damages against FRB for alleged retaliatory employment decisions or conduct to the extent that those decisions or alleged conduct are contrary to policies that FRB has instituted in good faith.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Award of Punitive Damages Unconstitutional)

The claim for punitive damages in the Demand violates the rights of First Republic Bank to protection from excessive fines, as provided in the Eighth Amendment to the United States Constitution and in Article 1, Section 17 of the Constitution of the State of California, and violates the rights of the Bank to procedural and substantive due process under the Fifth and Fourteenth Amendments to the United States Constitution and under the Constitution of the State of California.

*** 

First Republic does not presently know all of the facts and circumstances regarding Valverde's respective claims. The Bank reserves the right to amend this Answer and its Affirmative Defenses should it later discover facts demonstrating the existence of additional affirmative or other defenses.

74932702v.1

## PRAYER

WHEREFORE, First Republic prays for judgment against Valverde as follows:

1.  That Valverde takes nothing by his Demand;

2.  That judgment be entered in favor of FRB and against Valverde on all causes of action;

3.  That FRB be awarded reasonable attorneys' fees according to proof;

4.  That FRB be awarded the costs of suit incurred herein; and

5.  That FRB be awarded such other relief as the arbitrator deems appropriate.

DATED: September 20, 2021

Respectfully submitted,

SEYFARTH SHAW LLP

By: _____
    Brian T. Ashe
    Bailey K. Bifoss

Attorneys for Respondent
FIRST REPUBLIC BANK

6

RESPONDENT'S ANSWER TO CLAIMANT'S DEMAND; CASE NO.: 01-21-0004-6377

74932702v.1

1

## PROOF OF SERVICE

2   I am a resident of the State of California, over the age of eighteen years, and not a party to the
3 within action.  My business address is 560 Mission Street, Suite 3100, San Francisco, California 94105.
On September 20, 2021, I served the within document(s):

4   **RESPONDENT'S ANSWER AND AFFIRMATIVE DEFENSES IN RESPONSE**
  **TO CLAIMANT JOHNNY VALVERDE'S DEMAND FOR ARBITRATION**

5

6 ☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid,
  in the United States mail at San Francisco, California, addressed as set forth below.

7 ☐ by causing Nationwide Legal LLC to personally deliver the document(s) listed above to the
  person(s) at the address(es) set forth below.

8

9 ☐ by placing the document(s) listed above in a sealed Federal Express envelope with postage paid
  on account and deposited with Federal Express at San Francisco, California, addressed as set
  forth below.

10

11 ☒ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth
  below.

12

13 Denise M. Crow        *Case Manager, AAA*
American Arbitration Association
14 45 River Park Place, W S-308
Fresno, CA  93720
15 Telephone: (559-490-1900
Email: DeniseCrow@adr.org

16 Phil Horowitz         *Attorneys for Claimant*
LAW OFFICES OF PHIL HOROWITZ  Johnny Valverde
17 428 Thirteenth Street, 11th Floor
Oakland, CA  94612
18 Telephone:  (415) 391-0111
Email: phil@philhorowitz.com

19

20   I am readily familiar with the firm's practice of collection and processing correspondence for
mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with
21 postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party
served, service is presumed invalid if postal cancellation date or postage meter date is more than one day
22 after date of deposit for mailing in affidavit.

23   I declare under penalty of perjury under the laws of the State of California that the above is true
and correct.

24

25   Executed on September 20, 2021, at San Francisco, California.

26

               Regina Abdul-Rahim

27 75116123v.1

28

# EXHIBIT C

## STATE OF CALIFORNIA

## DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION

In the Matter of              )

                        )

    FIRST REPUBLIC BANK      )     APPOINTMENT AND TENDER

                        )     OF APPOINTMENT AS RECEIVER

                        )

_____)

### I.    FINDINGS

The Commissioner of Financial Protection and Innovation of the State of California (the "Commissioner") finds:

1.      The Commissioner took possession of the property and business of First Republic Bank (the "Bank") and ordered that the Bank be liquidated. The Order Taking Possession of Property and Business and Order of Liquidation are each hereby referred to and by this reference incorporated herein and the findings therein are hereby adopted as findings herein.

2.      The deposit accounts of the Bank are insured by the Federal Deposit Insurance Corporation (the "FDIC"), in accordance with the Federal Deposit Insurance Act.

3.      The FDIC is qualified to act as the receiver of the Bank.

4.      It is in the best interests of all those impacted by the Order of Possession and Order of Liquidation to appoint and to tender to the FDIC the appointment as receiver of the Bank.

### II.    APPOINTMENT AND TENDER OF APPOINTMENT

On the basis of the Findings set forth above and pursuant to Financial Code Section 620, the Commissioner appoints and tenders to the FDIC the appointment as receiver of the Bank.

DATED: May 1, 2023
        San Francisco, California

_____
CLOTHILDE V. HEWLETT
Commissioner
Department of Financial Protection and Innovation

# EXHIBIT D



**FDIC** Federal Deposit
Insurance Corporation

May 1, 2023

Ms. Clothilde "Cloey" V. Hewlett, Commissioner
California Department of Financial Protection & Innovation (DFPI)
One Sansome Street, Suite 600
San Francisco, CA 94104

Subject:        First Republic Bank
                San Francisco, CA – In Receivership
                Acceptance of Appointment as Receiver

Commissioner Hewlett,

Please be advised that the Federal Deposit Insurance Corporation accepts its appointment as Receiver of the
captioned depository institution, in accordance with the Federal Deposit Insurance Act, as amended.

Sincerely,

FEDERAL DEPOSIT INSURANCE CORPORATION

By: _____

Name: _George R. Fritz_
        Receiver-in-Charge

1

# EXHIBIT E

SEYFARTH SHAW LLP
Brian T. Ashe (SBN 139999)
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:    (415) 397-2823
Facsimile:    (415) 397-8549
bashe@seyfarth.com

Attorneys for Respondent and Proper Party In Interest
FEDERAL DEPOSIT INSURANCE CORPORATION,
as Receiver for First Republic Bank

JAMS ARBITRATION

|  |  |
|---|---|
| JOHNNY VALVERDE, an individual,<br><br>               Claimant,<br>     v.<br>FIRST REPUBLIC BANK, a business from<br>unknown and DOES 1-50,<br><br>              Respondents. | JAMS Ref. No.: 5100000057<br><br>**NOTICE OF SUBSTITUTION OF FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST REPUBLIC BANK** |

**TO JAMS, THE ARBITRATOR, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that the Federal Deposit Insurance Corporation ("FDIC"), as Receiver for First Republic Bank ("FDIC-R"), pursuant to 12 U.S.C. §§ 1819 and 1821, files this Notice of Substitution of the FDIC-R in place of Respondent First Republic Bank with respect to this action.

On May 1, 2023, the California Department of Financial Protection and Innovation closed First Republic Bank and appointed the FDIC as Receiver for First Republic Bank pursuant to 12 U.S.C. § 1821(c)(5). The FDIC accepted this appointment on the same date. A copy of the letters appointing FDIC as Receiver and FDIC's acceptance of its receivership appointment are attached as Exhibits 1 and 2.

By virtue of the FDIC-R's appointment, it has succeeded to "all rights, titles, powers, and privileges" of First Republic Bank. 12 U.S.C. § 1821(d)(2)(A)(i).

1     Pursuant to 12 U.S.C. § 1819, the FDIC-R is now the real party in interest in this action and so

2     notifies JAMS and counsel for Claimant of its substitution for Respondent First Republic Bank in this

3     action.

4     DATED: July 24, 2023                    Respectfully submitted,

5                                             SEYFARTH SHAW LLP

6

7                                     By:

8                                             Brian T. Ashe
                                              Attorneys for Respondent and Proper Party
9                                             in Interest
                                              FEDERAL DEPOSIT INSURANCE
10                                            CORPORATION, as Receiver for
                                              First Republic Bank

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

96832679v.1

# EXHIBIT 1

# STATE OF CALIFORNIA

# DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| FIRST REPUBLIC BANK | ) | APPOINTMENT AND TENDER |
| | ) | OF APPOINTMENT AS RECEIVER |
| | ) | |
| _____ | ) | |

## I.    FINDINGS

The Commissioner of Financial Protection and Innovation of the State of California (the "Commissioner") finds:

1.    The Commissioner took possession of the property and business of First Republic Bank (the "Bank") and ordered that the Bank be liquidated.  The Order Taking Possession of Property and Business and Order of Liquidation are each hereby referred to and by this reference incorporated herein and the findings therein are hereby adopted as findings herein.

2.    The deposit accounts of the Bank are insured by the Federal Deposit Insurance Corporation (the "FDIC"), in accordance with the Federal Deposit Insurance Act.

3.    The FDIC is qualified to act as the receiver of the Bank.

4.    It is in the best interests of all those impacted by the Order of Possession and Order of Liquidation to appoint and to tender to the FDIC the appointment as receiver of the Bank.

## II.    APPOINTMENT AND TENDER OF APPOINTMENT

On the basis of the Findings set forth above and pursuant to Financial Code Section 620, the Commissioner appoints and tenders to the FDIC the appointment as receiver of the Bank.

DATED:  May 1, 2023
         San Francisco, California

_Clothilde V Hewlett_
_____
CLOTHILDE V. HEWLETT
Commissioner
Department of Financial Protection and Innovation

# EXHIBIT 2



**Federal Deposit
Insurance Corporation**

May 1, 2023

Ms. Clothilde "Cloey" V. Hewlett, Commissioner
California Department of Financial Protection & Innovation (DFPI)
One Sansome Street, Suite 600
San Francisco, CA 94104

Subject:     First Republic Bank
             San Francisco, CA – In Receivership
             Acceptance of Appointment as Receiver

Commissioner Hewlett,

Please be advised that the Federal Deposit Insurance Corporation accepts its appointment as Receiver of the
captioned depository institution, in accordance with the Federal Deposit Insurance Act, as amended.

Sincerely,

FEDERAL DEPOSIT INSURANCE CORPORATION

By:
Name:     George R. Fritz
          Receiver-In-Charge

## PROOF OF SERVICE

I am over the age of eighteen years, and not a party to the within action.  My business address is 560 Mission Street, Suite 3100, San Francisco, California 94105.  On July 24, 2023, I served the within document(s):

**NOTICE OF SUBSTITUTION OF FEDERAL DEPOSITION INSURANCE CORPORATION AS RECEIVER FOR FIRST REPUBLIC BANK**

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California, addressed as set forth below.

☐ by causing Nationwide Legal LLC to personally deliver the document(s) listed above to the person(s) at the address(es) set forth below.

☐ by placing the document(s) listed above in a sealed Federal Express envelope with postage paid on account and deposited with Federal Express at San Francisco, California, addressed as set forth below.

☒ by transmitting the document(s) listed above, electronically, via JAMS Access to the e-mail addresses set forth below.

Phil Horowitz
phil@philhorowitz.com
Christopher Banks
chris@philhorowitz.com                           *Attorneys for Claimant*
LAW OFFICES OF PHIL HOROWITZ               Johnny Valverde
428 Thirteenth Street, 11th Floor
Oakland, CA  94612
Telephone:  (415) 391-0111

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct

Executed on July 24, 2023, at San Francisco, California.

_____
Mayela McArthur

87792064v.I